THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
IVERY WILLIAMS, Defendant-Appellant.

First District (3rd Division)   No. 76-476

Opinion filed September 27, 1978.

James J. Doherty, Public Defender, of Chicago (Sam Majerowicz, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Ira H. Raphaelson, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Ivery J. Williams, was charged with the offense of theft of property valued in excess of $150 in violation of section 16(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 16—1(a)). Following a jury trial he was found guilty and sentenced to one to three years in the Illinois State Penitentiary. The issues presented on appeal are: (1) whether reference to the defendant's failure to explain possession of the stolen goods at the time of his arrest violated his right to remain silent; (2) whether the defendant's felony theft conviction must be reduced to misdemeanor theft where no instruction as to the element of value was given to the jury; and (3) whether the trial court abused its discretion in denying the defendant probation.

Jean Reed testified that on April 30, 1975, she was employed as a security officer for Warshawsky & Company at its main warehouse at 2211 South Tripp. She arrived at approximately 6:10 a.m. and went to the loading dock area. On her rounds she noticed two large cartons near the lower area of the dock under a staircase. There was no documentation of any sort on the outside of the boxes. She took a red marking pen and put three red dots on each box and left them there.

At about 6:30 a.m. Jerry Coleman, the dispatcher, arrived. Five minutes later, the defendant arrived, pushed the buzzer to be admitted and Coleman let him in. After greeting Coleman the defendant started up his truck. At this time, Reed left the dock area and caught the elevator to the second floor, walked down the stairs leading to the dock area and hid behind some boxes where she had a clear view of the boxes she had marked. She saw the defendant get out of the truck and go over and talk with Coleman. According to Reed, the defendant went back to the truck, raced the engine, got out and went over to the boxes. He then pulled the

boxes from under the staircase, put them in the cab of his truck, hitched the cab to a trailer and proceeded to pull out. Coleman opened the door to let him drive out. In the meantime, Reed went to the personnel office so she could have a good view of the parking lot. While in the personnel office, she called Vic Miller, the head of security. She saw the defendant stop the truck, walk over to a Cadillac and put both boxes in the trunk of that car. He then dropped the loaded trailer at the dock, hitched up to an empty trailer and came back.

Reed testified that she left the personnel office and waved at the defendant, stopping him on his way back to the loading area. She asked him about the cartons, and after first denying any knowledge, he admitted taking the boxes. He told her he would bring the boxes back and asked her to "give him a break." At about this time Miller arrived and asked what happened. Reed told the defendant to explain and the defendant told Miller that Reed had caught him taking some boxes. The three of them walked over to the gold Cadillac and the defendant took the keys out of his pocket and opened the trunk. Inside the trunk were the two boxes that Reed had marked. The cartons contained assorted merchandise, including tape recorders, radios, a spotlight and a convertible top.

At this time, Arthur Hooker, another security guard arrived. Hooker testified that after viewing the merchandise, he asked the defendant what he was doing with Coleman's keys. The defendant replied that he had borrowed the car. Hooker told the defendant that he was a police officer and advised the defendant of his *Miranda* rights. He and Miller then went to the warehouse to bring Coleman to the car.

At the car, Coleman stated he had no knowledge of the theft. He told the guards he had lent his car to the defendant by giving him the keys, but did not know what the defendant intended to do with the car. According to Hooker, the defendant told Coleman he was sorry.

Officer Brian Arbuthnot, a Chicago policeman, was called to the scene where he arrested both Coleman and the defendant. Officer Arbuthnot testified, without objection, that at the police station the defendant refused to make a statement and was placed in the lockup, and that the defendant did not show him any piece of paper which authorized or instructed him to move the boxes.

Further testimony for the State described Warshawsky's merchandise delivery procedures. Items were always labeled with destination documentation, were never to be transported in cabs of trucks by truck drivers, and trucks were loaded from the dock by dock personnel.

The defendant testified on his own behalf that on the morning in question he arrived at work at about 6:30 a.m. After greeting Reed, he saw Coleman and asked him for the keys to his car so that he could put his

"C.B." radio and tools in the trunk. The defendant's car had been broken into about a week and a half before, while Coleman's car had an alarm on it and was parked in the company lot. The defendant then went to his truck and started the engine. Inside the cab he saw a note on the clipboard that read: "Put the boxes in G car." The defendant backed up his truck, put the boxes in the cab, attached a trailer and pulled out into the parking lot. He testified that he assumed that "G" car meant a gold or gray car. Those were the colors of the cars owned by his two bosses. There was only one car out in the parking lot, Coleman's gold Cadillac, and he placed the boxes in the trunk of that car. On his way back inside, Reed called to him and told him to bring the boxes that he had taken out. The defendant testified that she asked him if Coleman gave him the boxes and he said no. He tried to tell her that he had orders to take the boxes but she cut him off. Miller then joined them and the defendant testified that both Reed and Miller attempted to make him say that Coleman gave him the boxes.

The defendant testified that he did occasionally receive orders by means of a note left in his cab, such as to get gas, and also that he had occasionally been told by his prior foreman to transport boxes in his cab although such occurrences were unusual. The defendant denied having said that Reed caught him or that he asked her to give him a break. He also denied that the boxes were under the stairway, testifying that one box was beside his truck and one was near the stairway. He denied any intent to steal anything and stated that he was just following an order. On cross-examination the defendant further stated without objection that he never showed the three security officers or the police officer the note which directed him to put the boxes in the "G" car.

Coleman was called by the defendant and testified that when he first saw the defendant in the warehouse that morning, the defendant had a "C.B." radio set under his arm. He testified that he had been giving his keys for his car to the defendant every day since the defendant's car had been broken into. The defendant had permission to go into the trunk of the car once he had the keys. He stated that the defendant had to leave his tools outside the warehouse because of company policy. Coleman stated that when he looked into his car's trunk with the security officer, he was not in a position to see if there was anything else in the trunk besides those boxes. Coleman denied writing the note to the defendant directing him to put the cartons in his car.

In rebuttal, Reed testified that she offered the defendant "no deal" and had no authority to do so. Miller also testified in rebuttal that the defendant had said to him that Reed had caught him taking some merchandise. Both Reed and Miller testified that they saw no "C.B." or tools in Coleman's trunk.

Following closing argument in which the State commented on the defendant's failure to show the exculpatory note to the police, without objection the jury was instructed as to the law. There was no instruction requiring proof of every material allegation in the indictment nor was the indictment read to the jury as part of the instructions. The instruction on the charge of theft contained no reference to the material element of value over $150. The verdict form was general and contained no reference to value. Judgment was entered upon the general verdict of guilty of theft, and the defendant appeals therefrom.

The defendant alleges that it was error under the principles of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, for the prosecutor to use the defendant's post-arrest silence to impeach his testimony. Specifically he alleges that it was error for Officer Arbuthnot to testify that after the defendant had been advised of his rights he refused to make a statement. Further, Arbuthnot testified that the defendant never showed him a piece of paper which authorized him to transport the boxes in question. Also in an alleged violation of *Doyle,* the defendant asserts that it was error for the State to ask the defendant on cross-examination whether he told the police officer after he was arrested and had been advised of his *Miranda* rights that he had the note and that he did not tell the police that a short time ago he had put his radio and tools into the car. In a similar vein the defendant alleges that under *People v. Rehbein* (1977), 54 Ill. App. 3d 93, 99, 369 N.E.2d 190, *appeal allowed* (1978), 67 Ill. 2d 594, it was error for the State to refer to the fact that the defendant did not show the note in question to any of the security guards.

■■ In considering the last contention first, we find that it was not error for the court to allow the State to refer to the fact that the defendant did not show the note in question to any of the security guards who detained him. In *Rehbein* the testimony in violation of *Doyle* occurred when the prosecutor elicited testimony from the police officer following his arrest of the defendant. The *Doyle* case specifically held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process clause of the Fourteenth Amendment." (*Doyle,* 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.) The testimony of the security guards referred to conduct that arose prior to the defendant's confrontation with the police and his arrest and Miranda warnings.

With regard to the testimony of Arbuthnot and the cross-examination of the defendant, the State does not deny that this was error but instead urges that the failure to object constitutes a waiver. To this, the defendant replies that this was plain error. Under Supreme Court Rule 615 "Plain errors or defects affecting substantial rights may be noticed although they

were not brought to the attention of the trial court." (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).) In *People v. Howell* (1975), 60 Ill. 2d 117, 120-21, 324 N.E.2d 403, the court said:

"* * * Rule 615(a) does not mandate that a reviewing court consider all errors involving substantial rights whether or not they had been raised in the trial court. Rather the rule is intended as a means of meliorating the harshness of the strict application of the waiver rule. It permits the court on review to take notice of errors appearing upon the record which deprive the accused of substantial means of enjoying a fair and impartial trial and in criminal cases in which the evidence is closely balanced to consider errors that have not been properly preserved."

Thus, the Supreme Court in *Howell* construed Rule 615(a) to mean that a reviewing court could, but was not required to, consider a substantial error where no objection had been made in the trial court. The *Howell* court indicated that it favored such review of errors not properly preserved in cases where the evidence was "closely balanced." Because the record demonstrates that the evidence here was not closely balanced, our decision is that Rule 615(a) should not be applied to excuse the lack of objection to Arbuthnot's testimony and the cross-examination of the defendant.

■■ The defendant in this appeal never questions whether he was proved guilty beyond a reasonable doubt. The evidence established that one security guard saw the defendant take two large cartons containing the merchandise in question and place them in the automobile trunk. The defendant admitted telling that security guard that he took the boxes, and a second security guard testified that the defendant told him that the first guard had caught the defendant taking the cartons. The evidence also indicated that the company's merchandise delivery procedures were inconsistent with the defendant's defense that he had received the note instructing him to put the cartons in an automobile. Most significant, the employee who the defendant testified had written the alleged note denied giving such instructions. The failure of the defendant to show the note he claimed he had in his pocket to any of the security guards when he was apprehended and questioned by them was as indicated above, properly before the jury, and was additional incriminating evidence. For these reasons, we decline to apply the plain error doctrine and conclude the defendant's failure to object at trial waived any error in the testimony offered against him.

■■ As to the defendant's second point on appeal, that where there is no instruction on value in a theft prosecution a felony theft conviction cannot be sustained, the State concedes that error has been committed and that the defendant can only be held guilty of misdemeanor theft. (*People v.*

*Cunitz* (1977), 45 Ill. App. 3d 165, 359 N.E.2d 1070; *People v. Pugh* (1975), 29 Ill. App. 3d 42, 329 N.E.2d 425.) Misdemeanor theft is a Class A misdemeanor which carries with it a maximum term of less than one year. (Ill. Rev. Stat. 1975, ch. 38, par. 16—1(e)(1); ch. 38, par. 1005—8—3(a)(1).) In view of the sentence of one to three years imposed on the defendant for felony theft the case must be remanded for resentencing.

Finally, the defendant contends that the trial court abused its discretion in denying his application for probation and that the cause should be remanded to a judge other than the trial judge. The defendant argues that the court improperly considered three factors in sentencing the defendant: (1) the seriousness of the employee theft problem at Warshawsky and Company; (2) its mistaken belief that because he submitted an application for probation, the defendant did not think the crime was serious; and (3) that the defendant claimed his innocence throughout the trial and lacked a penitent spirit. While these statements do suggest consideration of improper factors in determining the defendant's sentence, we do not deem it necessary to weigh them at this time since they are unlikely to recur at the new sentencing hearing.

For the foregoing reasons, the conviction and judgment for theft are modified to reflect a conviction and judgment for misdemeanor theft. The cause is remanded for resentencing.

Modified in part and remanded.

SIMON and McGILLICUDDY, JJ., concur.