THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LOUIS BULLINER, Defendant-Appellant.

First District (3rd Division)   No. 1—87—0366

Opinion filed September 25, 1991.

Theodore Gottfried and David M. Goldwin, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Paul Gliatta, and Joseph J. Higgins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE* delivered the opinion of the court:

Defendant, Louis Bulliner, appeals from his conviction and sentence for attempted murder and aggravated battery. Defendant argues that he was denied a fair trial, that the jury was improperly instructed, and that the statute under which he was convicted is unconstitutional.

On the morning of June 5, 1985, defendant was arrested in his home in an apartment hotel located at 6434 South Cottage Grove in Chicago. Defendant was charged with beating and shooting Joseph Clay, another resident of the hotel.

Defendant was tried before a jury. During the trial, Lawrence Ogbo was called as a witness on behalf of the State. Ogbo testified that he was the manager of the hotel, that defendant and Clay were the only residents, and that both lived on the second floor of the building. In June 1985, because of renovations, the electricity in the hotel was turned off and defendant and Clay were using extension cords to obtain electricity from a store on the ground floor of the building. Ogbo testified that during the first week of June, defendant told him that Clay had taken defendant's extension cord, leaving defendant without electricity. Ogbo told defendant that he would talk to Clay, and defendant responded that if Clay did it again, defendant "might do something to him."

Ogbo further testified that in the early morning hours of June 5, 1985, he received a telephone call from defendant in which defendant stated that he had injured Clay. Ogbo stated that defendant asked Ogbo to call the police and to come and take Clay to the hospital. Ogbo also stated that defendant told him that Clay had hit him first.

Ogbo did not call the police, and he did not go to the hotel until the following morning. When he arrived, he was met by the police, who asked him to show them where defendant lived. Ogbo took the officers to defendant's apartment, where defendant was arrested and taken into custody.

Joseph Clay testified that in 1985, he lived at 6434 South Cottage Grove and worked as a night watchman for the building. Clay testified that the lights in the building were turned off in May 1985 and that he was given permission from Mr. Nisel in the submarine shop next door to hook up an extension cord from the shop to his apartment. Clay stated that shortly after he hooked up the extension cord,

---

*This opinion was authored prior to Justice White's retirement.

he noticed that defendant also had plugged into the cord. Clay stated that, because Nisel had told him not to allow anyone else to plug into the cord, he asked defendant to remove his cord. Clay testified that when defendant refused to do so, he contacted Ogbo because he did not want to get into an argument with defendant.

Clay further testified that on the evening of June 4, 1985, he had dinner at his nephew's house and returned to the hotel at approximately 10:30 p.m. Clay testified that he had entered the building and was walking toward the stairway, when he was attacked by defendant and another individual. According to Clay the two were armed with baseball bats and they repeatedly struck him on the head with the bats. Clay stated that he picked up a snow shovel and started swinging it at his assailants. He then ran up to the second floor and attempted to get into his apartment.

Clay stated that as he was attempting to unlock his door, defendant pointed a gun at him and began shooting. Clay then ran across the hall and entered another apartment, where he placed a table in front of the door to prevent the others from entering. Clay testified that as he was placing the table in front of the door, shots were fired through the door striking him in the knee cap, the groin, and the right arm.

Clay remained in the vacant apartment until the following morning, when he heard his nephew knocking on the door of his own apartment across the hall. Clay's nephew contacted the police, and Clay was taken by ambulance to the University of Chicago Hospital.

Defendant testified in his own behalf. He stated that because the electricity had been turned off, he used an extension cord to obtain power from a secondhand store next door. Defendant testified that two days before his arrest, he returned to the building and discovered that his extension cords were missing. Defendant stated that he talked to Ogbo about the missing cords and that Ogbo agreed to speak to Clay. Defendant denied making any threats against Clay in his conversation with Ogbo.

Defendant testified that on June 4, 1985, he had replaced the cords and was watching television in his apartment when he heard Clay shouting in the hallway. Defendant stated that Clay kicked his door and called to him to come out of the apartment. Defendant further stated that Clay went away after defendant threatened to call the police. Approximately 15 minutes later, the power went off in defendant's apartment. Defendant found a flashlight, armed himself with a gun and a baseball bat, and went to see what had happened. Defendant stated that when he reached the top of the stairs, he saw

that the light in the hall was still on and that his extension cord had been unplugged.

Defendant further testified that as he was plugging the cord back in, Clay sprayed him in the face with mace and hit him across the back and shoulders with a shovel. Defendant testified that he hit Clay with the baseball bat and that the two of them fought from the first floor, up the stairs to the second floor, and into a vacant apartment. Defendant stated that as he attempted to back out of the apartment, he fired several shots at Clay, who was swinging the shovel at him and threatening to kill him. Defendant further stated that he shot Clay because he was afraid for his life. Following the shooting, defendant returned to his apartment, where he telephoned Ogbo, told him about the fight, and asked him to call the police.

The jury found defendant guilty of attempted murder and aggravated battery and defendant was sentenced to six years in prison. This appeal followed.

Defendant argues that his conviction must be reversed because the trial court erred in refusing to permit him to testify concerning the victim's violent propensities, because comments by the assistant State's Attorney on defendant's post-arrest silence violated his due process rights, and because the attempted murder statute and jury instructions are unconstitutional.

Defendant's claim that his due process rights were violated is based on questions and comments made by the assistant State's Attorney during cross-examination and closing arguments. During cross-examination, the assistant State's Attorney questioned defendant about the injuries he claimed he suffered in the fight with Clay. After defendant stated that he had been struck across the back and shoulder, the following exchange took place:

> "Q. Did you tell that to the police?
> A. They didn't ask me.
> Q. You didn't relate that to them, right?
> A. They didn't ask me.
> Q. You didn't relate that to them, right?
> A. They didn't ask me.
> Q. Answer the question.
> A. No."

Later, during closing arguments, the assistant State's Attorney stated:

> "I submit to you, ladies and gentlemen, there was no fight between the two of them. Joe Clay was fighting for his life. That's the only fight that was going on down there, and if the

Defendant had any injuries on his body he would have told the police about it."

No objection was made to the questions or the closing arguments.

On appeal, defendant argues that the questions and comments quoted above violated his right to remain silent as guaranteed by the fifth amendment of the United States Constitution (see *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), since his post-arrest silence was used against him to undermine his credibility. We agree.

■ In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the United States Supreme Court stated that while it was true that the *Miranda* warnings contained no express assurance that silence carried no penalty, such an assurance was implicit in the warnings. The Court added:

"In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. at 618, 49 L. Ed. 2d at 422, 96 S. Ct. at 2245.

In *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 325 N.E.2d 295, this court relied on the decision in *Doyle* in reversing a conviction where the assistant State's Attorney was allowed to impeach a defendant's exculpatory trial testimony with his failure to inform the police of his explanation following his arrest. Similarly, in *People v. Adams* (1981), 102 Ill. App. 3d 1129, 430 N.E.2d 267, the appellate court ruled that it was reversible error for the prosecutor to comment on a defendant's post-arrest silence.

In *Adams*, the defendant was arrested and charged with murdering her boyfriend. Defendant made no statement following her arrest, but the next morning she stated that she had acted in self-defense. At trial, the prosecutor questioned defendant about the first time she told police that she acted in self-defense and she admitted that she had not made this claim until 10 hours after her arrest. In closing arguments, the prosecutor pointed out that she had not claimed self-defense until several hours after her arrest and argued that, therefore, her testimony was not true.

In reversing defendant's conviction, the appellate court stated that the prosecutor's questions and comments suggested to the jury that if defendant were innocent and acting in self-defense she would have so informed the police immediately after her arrest. The court found that the prosecutor's actions were improper and in violation of the Supreme Court's decision in *Doyle*. We believe a similar finding is

required in the present case.

■ Here, as in *Adams*, defendant claimed he was acting in self-defense. By repeatedly asking defendant whether he had told the police that Clay had struck him and by later commenting that if defendant had been injured he would have told the police, the assistant State's Attorney suggested that if defendant's claim that he was acting out of fear for his life was truthful, he would have made a statement to that effect at the time of his arrest. This clearly was a violation of the *Doyle* doctrine.

In arguing against reversal of defendant's conviction, the State contends that the issue has been waived because of defendant's failure to object to the questions and comments or raise them in a post-trial motion. The State further contends that even if the issue was not waived any error was harmless because the evidence of defendant's guilt was so overwhelming. We disagree.

In *Adams*, the court rejected the claim that defendant's failure to object to the improper cross-examination and argument constituted a waiver of the issue. The court concluded that fundamental fairness required that the matter be considered. (102 Ill. App. 3d at 1132.) Also, in its decision in *Monaghan,* this court found that the prosecutor's comments on the defendant's silence amounted to plain error and that plain error affecting substantial rights could be noticed on appeal although not brought to the attention of the trial court. (40 Ill. App. 3d at 326; see also *People v. Pegram* (1988), 124 Ill. 2d 166, 529 N.E.2d 506.) Accordingly, we find no waiver.

■ Nor do we find that the assistant State's Attorney's questions and comments were harmless error. Contrary to the State's contentions, the evidence of defendant's guilt was not overwhelming. There were no witnesses to defendant's altercation with Clay and, thus, the case turned on whether the jury believed defendant's version of the facts or Clay's version. Under these circumstances, the credibility of defendant was a crucial element of the case and the use of an improper means of impeachment cannot be deemed harmless. See *People v. Adams*, 102 Ill. App. 3d at 1133; *People v. Monaghan*, 40 Ill. App. 3d at 327.

■ Because we have decided that defendant's conviction must be reversed, we need not reach the other arguments raised by defendant in this appeal. We do note that, with regard to defendant's claims concerning the constitutionality of the attempted murder jury instruction, the use of this instruction recently was upheld in *People v. Moore* (1990), 204 Ill. App. 3d 694, 562 N.E.2d 215.

■ As for defendant's arguments that the attempted murder

statute is unconstitutional because it classifies attempted murder as a Class X felony while voluntary manslaughter is classified as a Class 1 felony, we note that in *People v. Carrillo* (1986), 148 Ill. App. 3d 11, 449 N.E.2d 44, a similar claim was made and rejected concerning the armed violence statute. Accordingly, we find, as the court did in *Carrillo*, that the statutory scheme in question is correct.

The judgment of the circuit court is reversed, and this cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

RIZZI and GREIMAN, JJ., concur.